**SACK & SACK, LLP**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
***Attorneys for Plaintiff, Megan Messina***
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

**MEGAN MESSINA**,                                 :
                                                   :          <u>16-CV-03653 (LGS)</u>
                              Plaintiff,            :
                                                   :          <u>COMPLAINT</u>
               vs.                                 :
                                                   :          <u>JURY TRIAL REQUESTED</u>
**BANK OF AMERICA CORPORATION,**                    :
**BANK OF AMERICA SECURITIES, LLC,**                :
**MERRILL LYNCH, PIERCE, FENNER &**                 :
**SMITH INCORPORATED, BANK OF**                     :
**AMERICA MERRILL LYNCH,**                          :
                                                   :
                              Defendant.

------------------------------------------------------------ X

Plaintiff Megan Messina ("*Messina*" or *"Plaintiff"*), by her attorneys, Sack & Sack, LLP, as and for her complaint against Bank of America Corporation, Bank of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Bank of America Merrill Lynch ("*BofA*" or *"Defendant"),* alleges as follows:

<u>NATURE OF THE ACTION</u>

1.      Messina brings this action against BofA to redress unlawful discrimination and subsequent retaliation in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights of 1964, 42 U.S.C.A §2000e (*"Title VII"*), New York State Human Rights Law, Executive Law § 290 <u>et seq.</u> ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 <u>et seq.</u> ("*NYCHRL*") based upon her gender, female.

2.      Specifically, Messina suffered gender disparities in compensation and business

opportunities at the nation's largest bank and brokerage firm.

3.    BofA fails to pay male and female employees equal wages in violation of the Federal Equal Pay Act, 29 U.S.C. § 206(d) (the "*EPA*"), and the New York State Labor Law § 194 (the "*Labor Law*").

4.    Beneath the veneer of a world-class financial institution, BofA treats their female Managing Directors as second-class citizens. Plaintiff Messina is no exception. Every year throughout the liability period in this case, Messina has earned substantially less than similarly-situated males solely because she is a woman.

5.    This earnings disparity is a result of, among other factors, BofA's unvalidated company- wide policies and practices that govern compensation and the distribution of accounts and business opportunities, and the lack of proper accountability measures to ensure fairness.

6.    As more specifically set forth herein, BofA's discriminatory animus towards Messina because she is a woman has resulted in diminished commercial opportunities, marginalization, excluding her from business functions, meetings and information, discrediting her efforts, paying her grotesquely lower than and disparately from her similarly situated male peers and ultimately destroying her career at BofA with the implication of ruining her future professional participation within the financial services industry.

7.    In addition to damages suffered as a consequence of BofA's unlawful gender discrimination, Messina alleges that BofA retaliated against her in violation of both Section 806 of the Sarbanes-Oxley Act of 2002 ("*SOX*") and the protective whistleblower provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78u-6, Section 922(h) ("*Dodd-Frank*").

8.    Specifically, Messina was retaliated against for her good faith and bona fide

complaints concerning unethical and unlawful actions undertaken by BofA employees, which complaints were blown off, ignored and disregarded by BofA's senior management, compliance and legal divisions.

9.     Messina's retaliatory suspension from her workplace took place immediately after and in close proximity in time to her complaints as a whistleblower.

10.     Despite her stellar professional qualifications, proven commercial skills, capabilities and competences, and unquestioned outstanding personal moral and ethical character spanning her long career in the financial services sector and on Wall Street, Messina experienced blatant gender bias and discrimination.

11.     This adversity and career setback was further aggravated by her whistleblower actions and complaints when she insisted on adhering to the BofA rules of business ethics and by reporting to her appropriate managers serious legal, ethical, business practices, regulatory and policy violations that Messina witnessed first-hand on numerous occasions which directly resulted in her retaliatory suspension.

12.     BofA intentionally and deliberately discriminated and retaliated against Messina as a consequence of her adhering to the law and her ethical, lawful, and industry-accepted, duty-bound obligations following the mantra, "If you see something, say something".

13.     At all times relevant herein, Defendant's employees, managers, and Human Resource specialists acted at the behest of Defendant during the course, and within the scope, of their employment with Defendant.

14.     Messina  seeks compensatory, liquidated, and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief, including liquidated damages and attorneys' fees.

## PARTIES

15.     Plaintiff Messina is a woman who lives at 441 West 21st Street, New York, New York 10011.  She is a citizen of the United States.

16.     Messina is currently employed by BofA, but as of the date of this Complaint has been unlawfully placed on administrative leave by BofA not to return to work until such time as further instructed.

17.     Upon information and belief, Defendant BofA is a Delaware corporation doing business within New York County in the State of New York and maintains corporate headquarters within the City and County of Charlotte- Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.

18.     Upon information and belief, Defendant BofA maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

19.     During all relevant times, Defendant BofA was Plaintiffs' employer within the meaning of all applicable statutes.

## JURISDICTION AND VENUE

20.     This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 1343, respectively, and 15 U.S.C. § 78u- 6(h)(l )(B)(i).

21.     This court has jurisdiction of Plaintiff s state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Plaintiff s federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

22.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred

within the Southern District of New York.

## ADMINISTRATIVE PROCEDURES

23.     On May 12, 2016, Messina filed a charge of discrimination with the Equal Employment Opportunity Commission ("*EEOC*").  Immediately upon receiving the notice of a right to sue from the EEOC ("*Right to Sue*"), Plaintiff will promptly amend this Complaint to add federal claims of discrimination.

24.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

25.     On May 12, 2016, Messina filed a Complaint with the Department of Labor ("*DOL*") alleging whistleblower retaliation in violation of SOX.  Immediately upon receiving the notice of a right to sue from the DOL, Plaintiff will promptly amend this complaint to add the appropriate claims of retaliation under SOX, to the extent required to do so.

26.     Any and all other prerequisites to the filing of this suit have been met.

## FACTS COMMON TO ALL COUNTS[1]

### PERSONAL AND PROFESSIONAL BACKGROUND

27.     Messina is a 42 year old female and is protected under the Federal, State and City anti-discrimination statutes protecting employees.

28.     Messina is a single mother and sole custodian of her three children, ages 11, 9, and 6.

29.     Messina is her children's primary caregiver and financial supporter.

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

30.     Messina is currently employed by BofA as its Co-Head of Global Structured Credit Products and Credit Asset Financing.

31.     Messina's Co-Head is David Trepanier ("*Trepanier*"), who shares the same title as Messina, Co-Head, Global Structured Credit Products and Credit Asset Financing

32.     In 1996, Messina graduated from Marymount College with a Bachelor of Arts degree (BA) in Sociology & History.

33.     Upon graduating, Messina immediately commenced employment in the financial services industry with Paine Webber.

34.     Messina worked at Paine Webber until 1998.

35.     From 1998 to 2007, Messina worked for Salomon Smith Barney.

### MESSINA'S RISE TO SUCCESS AT BOFA

36.     On September 23, 2007, Messina commenced employment with BofA as a Director.

37.     In December 2011, Messina was promoted to Managing Director.

38.     Throughout her tenure at BofA, in recognition for the success of the various business units she was responsible for managing, Messina consistently received stellar performance reviews concerning her diligence, competence, exceptional management skills, and ability to enhance the profitability of the business and services that she managed.  However, despite Messina's accomplishments, BofA failed to provide Messina equal pay to the pay of males for work requiring equal skill, effort and responsibility, and which has been performed under similar working conditions.

39.     Throughout her tenure at BofA, Messina has worked for many managers, all of whom have been men.

40.     From January 2009 to February 2015, Messina served as the Head of New Issue Global Structured Credit.

41.     In February 2015, Messina assumed her current role, Co-Head of Global Structured Credit Products, at which time she began to report to Frank Kotsen, Head of Global Credit and Special Situations ("*Kotsen*").

**KOTSEN DISCRIMINATED AGAINST MESSINA FROM DAY 1**

42.     At the time Messina became Co-Head of Global Structured Credit Products and continuously to date, she was (and remains) the only female reporting to Kotsen.

43.     Kotsen's revenue-producing direct reports currently include 10 other men:

| Name | Title |
|---|---|
| Brian Callahan | MD, Head of Loan Trading |
| Colin Stewart | MD, Head of Index Trading |
| Dan Bird | MD, Head of EMEA High Yield & Distressed Trading |
| David Lee | MD, Head of Credit Trading / Asia |
| **David Trepanier** | **MD, Co-Head, Global Structured Credit Products** |
| Lawrence Wolfson | MD, Head of High Yield Trading |
| Mayur Jethwa | MD, Head of EMEA IG Trading |
| **Megan Messina** | **MD, Co-Head, Global Structured Credit Products** |
| Mike Lee | MD, Co-Head, Distressed Trading |
| Mike Winn | MD, Co-Head, Distressed Trading |
| Oliver Wong | MD, Head of Aviation Trading |

44.     From the moment Messina was assigned as Kotsen's direct report, Kotsen made it clear that she was NOT welcome within his subordinate "bro's club" of all-male sycophants.

45.     In Messina's very first conversation with Kotsen following her promotion, he told her in a very off-putting manner, **"I don't understand what you do."**

46.     In the hopes of impressing upon Kotsen that she was significantly qualified and

incredibly knowledgeable in her sector, Messina took the opportunity at this first meeting to tell Kotsen about the value-add she could bring to the group on a day-to-day basis and the role of her product specialty (*i.e.*, new issue CLOs) in the marketplace as well as her ability to cross sell BofA's other products, given her extensive rolodex of contacts with significant customers.

47.     As Messina spoke to Kotsen on these very important items, Kotsen exhibited visible boredom and was blatantly not engaged.  Kotsen had no interest in learning about Messina or the product line and business that she successfully manages.

48.     Beginning with their very first meeting, Kotsen immediately made Messina feel like a second-class citizen. Throughout the course of calendar year 2015, Kotsen consistently and with increasing frequency excluded Messina from emails, meetings, get-togethers, and dinners that included his direct reports and/or Messina's clients while including her male peers.

49.     As the only woman in a sea of men under Kotsen, Messina never stood a chance to be included and therefore never stood a chance to succeed.

50.     In their first conversation, Kotsen was more interested in Messina's appearance than her professional skills and acumen.

51.     Kotsen saw Messina only as a woman and not as a colleague; and he made sure that she knew it.

52.     Insultingly, in this first conversation, Kotsen stopped Messina *twice* to ask demeaning and ludicrous questions such as: **"Have you colored your hair?"** and **"Have your eyes always been that blue?"**

53.     Surely Kotsen would not ask those irrelevant questions if Messina were a man.

54.     Contrary to BofA's purported "open door" policy and work ethic, shortly after Messina began to report to Kotsen, his assistant, Jennifer Benjamin, sent an email to all of the

300 employees reporting to him in the Credit Department establishing a "*closed door*" policy.

55.     Amazingly, according to the email, employees working for Kotsen were instructed that they were prohibited from speaking with Kotsen without an appointment - no popping in his office, no knocking on the door.

56.     Messina, in particular, was singled out and excluded from participating in any firm-sponsored client events by Kotsen's design.

57.     Despite repeated attempts to be added to email lists, Messina never even received invitations.

58.     Kotsen treated Messina more like a summer intern than an accomplished, experienced, and successful Managing Director at one of the world's largest banks, where her role was responsible for annually generating hundreds of millions of dollars in revenues.

59.     Kotsen disregarded Messina's contributions, skills, efforts and responsibilities because she is a woman.

60.     Kotsen has a problem with women.

61.     Kotsen has consistently failed and refused to mentor or promote women up the ranks at BofA.

62.     Kotsen, to Messina's deliberate exclusion, spends all of this time with Messina's Co-Head, David Trepanier, often hosting him for long chats – sometimes as often as three times per day – in his office, which is enclosed in glass for all to see.

63.     Kotsen's selective and discriminatory behaviors are demeaning and demotivating to Messina as a professional and are humiliating and demoralizing to Messina as a manager of her own direct reports.

**FAILED EFFORTS TO BREAK THROUGH KOTSEN'S DISCRIMINATORY ANIMUS**

64.     Kotsen has a long history of endearing himself exclusively to men in a "Kotsen Bros-Only Club."

65.     In an effort to dispel Kotsen's discriminatory animus towards Messina because she is a woman, Messina reached out to Kotsen on at least a monthly basis over the span of calendar year 2015.   Messina took these actions in order to establish a rapport with her chauvinistic supervisor, and to try to explain to him how she can collaborate, add value, and grow the Bank of America platform.

66.     In response to her diligent efforts, and to her dismay, Kotsen has either *blown off* Messina or utterly ignored her overtures towards forging a professional relationship.

67.     From day one, Kotsen has never taken Messina seriously – solely as a consequence of her gender.

68.     While all of Kotsen's reports, with the exception of only Messina, would meet with or at least speak to Kotsen on at least a daily basis, Messina was, and currently is being, consistently and deliberately excluded from any such communications with her immediate supervisor.

69.     Kotsen's discriminatory treatment of Messina, to the exclusion of her male peers, is not only illustrative of unlawful gender discrimination; it is also illustrative of poor management practices that results in, among other things, gender-based pay disparities.

70.     For example, as a seasoned manager, Messina has learned to maintain an "open-door" policy, which, in today's corporate environment, is expected of all managers. This means, without limitation, establishing a basis of trust with all direct reports and peers such that the lines of communication are, and remain, open.

71.     Kotsen has failed and refused to treat Messina with the degree of professionalism and courtesy that is warranted, and has been earned with, her title, knowledge, experience, and acumen.

72.     Undeterred by BofA's discrimination, Messina, year after year, has consistently outperformed her colleagues in peer and client satisfaction and rankings.

73.     In addition, Messina prides herself on the consistent and positive supervisor, peer and subordinate reviews that she has received throughout her tenure as a manager working at BofA.

74.     Those periodic and annual performance reviews clearly reflect the skills, attributes, and characteristics of Messina, a team leader invested in the philosophical and business model of Bank of America: ***Doing the Right Thing. Trusting and Teamwork. Inclusive Meritocracy. Winning. Leadership.***

### MANAGEMENT CONDONES KOTSEN'S DISCRIMINATORY BEHAVIOR

75.     Regretfully, Kotsen's bias and discriminary animus against women is known to, and condoned by his bosses and senior level management, James DeMare ("*DeMare*"), Global Head of Fixed Income, Currency and Commodities ("*FICC*") and Tom Montag ("*Montag*"), BofA's Chief Operating Officer ("*COO*"), further complicating the harm and discrimination suffered by Messina.

76.     To Messina's dismay, and to the dismay of all other women trying to work their way up BofA's ranks, BofA seems more concerned about offending the perpetration of discrimination than the discrimination itself and thus, would rather protect and defend Kotsen than reprimand, train, or counsel him.

77.     Despite Messina's optimistic efforts to "win" Kotsen's approval or even his

interest, Kotsen has never seen fit to learn about Messina, her business, her team, her mentees, her extensive client relationships, her ability to cross-sell the bank as a culture carrier and senior leader and woman, her extensive knowledge of her industry, her products, and the methods she uses to maximize revenues in her space.

### MESSINA ELEVATES HER CONCERNS OF UNLAWFUL ACTIONS TO MANAGEMENT, TO NO AVAIL

78.     Consistent with BofA policies and procedures, Messina elevated her concerns regarding Kotsen's discriminatory behaviors to Kotsen's manager, DeMare; as well as the Human Resources representative for Messina's business, Ava Mehta ("*Mehta*").

79.     Over the course of the past several months prior to filing this action, Messina met with DeMare in face-to-face meetings on at least four occasions where her concerns of Kotsen's discriminatory treatment was discussed.

80.     Separately, Messina met with Mehta on at least four occasions for the sole purpose of discussing Kotsen's discriminatory animus towards her.

81.     In this day and age, to even have to *complain* about gender discrimination is humiliating enough, let alone to recount the embarrassing and demoralizing treatment Messina has endured; especially for someone at her level, tenure, and experience.

82.     In each of her meetings with DeMare and Mehta, Messina complained of Kotsen's unwarranted bias and aversion to having any rapport with Messina because she is female and with women in general.

83.     Messina also complained about the consequences of Kotsen's discriminatory animus, particularly with respect to the unjustified and quite significant pay disparities between her and her similarly situated peers; currently the other Kotsen reports, all of whom are males.

84.     In each of these meetings with DeMare and Mehta, Messina also discussed her

knowledge of, and bearing witness to, the inappropriate, unethical, illegal trading behaviors in violation of various rules, regulations, laws and industry standards Messina has witnessed committed by her Co-Head, Trepanier, and others.

85.    Messina's complaints of discrimination and retaliation fell on deaf ears.

86.    Despite multiple meetings discussing Messina's complaints of these unlawful actions, BofA has not only failed to investigate any of Messina's complaints or take any remedial actions to address the rampant gender-based discrimination and compliance issues but has also failed to intervene when Messina was then retaliated against for her lawful complaints.

87.    To date, BofA has retaliated against Messina by placing her on administrative leave without justification, instructing her to not show up to work until further notice.

### MESSINA IS A VICTIM OF EGREGIOUS PAY DISPARITY

88.    As if being spoken to disrespectfully in front of your peers and subordinates and being excluded from meetings and opportunities was not hurtful and demoralizing enough, Kotsen, albeit consistent with his discriminatory animus towards Messina based upon her gender, took the first possible opportunity he had to pay Messina significantly less than her similarly situated male peers.

89.    In December 2015, Kotsen met with Messina to discus Messina's annual bonus for the 2015 calendar year.

90.    This meeting was the second and only other time Messina was ever permitted to meet with Kotsen.

91.    During this meeting, Kotsen took it upon himself to dispense with protocol and procedures and engage Messina in a conversation regarding her performance and contributions for 2015.

92.     Insultingly, as Kotsen reviewed Messina's peer reviews, he stated with skepticism and incredulity, **"I've never seen better peer reviews (360s) such as yours. Are these real?"**

93.     Kotsen reluctantly confided to Messina that according to client surveys (the Greenwich Surveys, Orion Survey) and informal customer feedback, Messina has consistently outperformed her Co-Head, Dave Trepanier.

94.     Despite the objective reviews of Messina's clients and customers, Kotsen's gender bias remained unwavered, as he awarded Messina a 2015 bonus of $1,550,000, nearly $4,000,000 less than her male Co-Head, Trepanier whose bonus was $5,500,000 – an astonishing difference of 360% for work requiring equal skill, effort and responsibility and which has been performed under similar working conditions!

95.     Subsequent to learning of her own 2015 bonus, Messina learned of the bonuses of other Kotsen reports.

96.     To add insult to injury, not only is Messina's 2015 bonus the lowest of all Kotsen reports by a significant margin, it is also grotesquely and disparately lower than many of Trepanier's reports, traders – who are less senior, less qualified, men.

97.     For instance, Aleksandar Murdzhev, a Director (one level below Messina) and line trader, was paid $2,250,000 total compensation, with a $250,000 base salary.

98.     Tim Murtha, a Vice President (two levels below Messina) and a trader working for Trepanier, received $1,350,000 as total compensation for 2015.

99.     Ricardo Arguello, Vice President and Trader, received $775,000 in total compensation of which $200,000 was base salary.

100.    Much to her utter disbelief, Messina has learned that her total annual

compensation, of which the annual bonus is the overwhelming majority, has been consistently slashed to grotesque levels well beneath those of her male peers, and in particular, her Co-Head, David Trepanier who performs with no greater skill or effort than Messina.

101.    Despite Messina's repeated demand for a legitimate, non-discriminatory reason as to why she has been paid significantly less than all of her male peers, BofA has failed to provide any explanation whatsoever.

102.    The pay disparity Messina suffers is in respect of both base salary and bonus.

103.    Upon information and belief, bonuses for the Kotsen reports are set by Frank Kotsen and approved by DeMare and Montag.

104.    As Co-Head of Global Structured Credit Products, Messina performed equal work to her male counterpart, Trepanier, requiring equal skill, effort and responsibility.

105.    Furthermore, Messina and Trepanier perform their respective jobs, duties  and responsibilities under similar working conditions.

106.    The significant pay disparities between Messina and Trepanier and other male Managing Directors are attributable to differentials based solely on sex.

107.    The following chart details the grotesque compensation disparity between Messina and her similarly situated male peers over the past three years based upon information and belief:

**DISPARATE COMPENSATION COMPARISON**

| Name | 2013 | 2014 | 2015 |
|---|---|---|---|
| David Lee | $4.0 million | $4.5 million | $4.0 million |
| Dan Bird | $4.0 million | $4.5 million | $5.0 million |
| Lawrence Wolfson | $5.6 million | $6.0 million | $6.5 million |

| **David Trepanier** | **$5.5 million** | **$6.0 million** | **$5.5 million** |
|---|---|---|---|
| Mike Winn | $4.0 million | $4.0 million | $4.0 million |
| John Klein | Not Employed at B of A | $3.0 million | $3.0 million |
| Mike Lee | $4.0 million | $4.0 million | $4.0 million |
| Oliver Wong | $2.5 million | $2.8 million | $3.0 million |
| Colin Stewart | $3.0 million | $3.0 million | $3.5 million |
| Brian Callahan | $2.0 million | $2.5 million | $1.5 million |
| Mayur Jethwa | Not Employed at B of A | Not Employed at B of A | $3.0 million |
| Scott Chestman | $3.5 million | $3.5 million | $3.75 million |
| **Megan Messina** | **$2.5 million** | **$2.75 million** | **$2.0 million** |

108.    Upon information and belief, some of these Kotsen reports are male individuals who have also received written contractual guarantees of bonus compensation over the past three years, while others have received "target letters" which were honored like contractual guarantees of bonus levels made to these males.

109.    Messina never received either a written bonus guarantee or a target letter.

110.    Upon information and belief, Kotsen is paid similarly to his predecessor, Graham Goldsmith, at an average level of $12,000,000 million per year.

111.    Upon information and belief, DeMare is paid at an average level of $15,000,000 million per year.

112.    For the last three years, Messina's total compensation in 2013 was $2,500,000, and in 2014 was $2,750,000 and in 2015 was $2,000,000.

## OTHER WOMEN AT BOFA SUFFER GENDER DISCRIMINATION

113.    Messina is not the only woman to suffer egregious discrimination and pay disparity.

114.    For example, Reena Kim is a female trader at BofA at the Director level and a direct report of Trepanier and is a victim of disparate pay practices at BofA based upon gender.

115.    Reena Kim's total compensation for 2015 was $1,250,000.

116.    Messina was shocked when she first learned of Reena Kim's bonus especially in light of the fact that Reena Kim's male peer received total compensation of $2,500,000.

117.    Reena Kim has consistently outperformed her male peers during her tenure at BofA.

118.    While she is not a member of the "Bros Club", Messina pointed out to Trepanier that Reena Kim had been a culture carrier, making a huge personal sacrifice for BofA back in 2011 when she volunteered to move to London for an extended assignment lasting two (2) years.

119.    During that time, Reena Kim built out the secondary market CLO Trading Desk for Europe, which, at the time, was virtually nonexistent.

120.    Over the course of her two (2) year tenure in London, Reena Kim drove up trading volume, revenue, and the bank's visibility in the market by garnering significant and unprecedented market share.

121.    Messina urged Trepanier that Reena's bonus should also recognize the fact that she retuned to New York in 2013, at which time she got married and gave birth to her first child.

122.    Despite the compelling points made by Messina, Trepanier believed that Reena Kim's annual bonus level was justified because **"she needs to be paid down"** for the three months she was on maternity leave.

123.    In response to Messina's pressing for a reason for the decrease in bonus, Trepanier, snidely and insensitively dubbed the reduction in what bonus was otherwise earned as a **"maternity leave discount."**

124.    Indeed, Trepanier paid down Reena Kim by 24%, making her the lowest-paid trader amongst her peers, all of whom are males.

125.    Messina was disgusted by Trepanier's comment, knowing that Reena's unjustified low bonus level had been approved by Kotsen, DeMare and Montag.

126.    To this outrageous comment about maternity leave, Messina responded, **"There is no such thing – Reena needs to be paid fairly."**

127.    In retaliation of Messina's objections on Reena's behalf, recently, Trepanier has since attempted to move Reena Kim out of trading and into an undefined position within the financing business.

128.    This position notoriously pays less ($950,000 for both current employees, one with 35 years served at BoA) than the current role she occupies and has little chance of career advancement.

### BOFA VIOLATES LAWFUL TRADING PRACTICES AND POLICIES

129.    In or around 2013, while Messina was head of the Primary CLO business, she developed a document called Primary CLO Transaction Guidelines.

130.    This multi-page document, that was vetted by internal and external legal counsel, reviews the protocol guidelines and rules for the Primary CLO business.

131.    Messina's group solicited this audit to take a deep dive into their business and help them build those guidelines.

132.    Despite his knowledge of Messina's staying up to speed on regulatory and

compliance mandates, Trepanier did not do the same for the secondary business, which he was Head of at the time.

133.    When Messina and Trepanier later became Co-Heads of the entire business, Messina suggested that Trepanier create a secondary CLO transaction guidelines document.

134.    Trepanier scoffed at this suggestion and dismissed it as needless and obstructive. He specifically said, **"Without guidelines, there are no boundaries, which is how we like it."**

135.    As a FINRA licensed Series 24 principal and manager, Messina was concerned about being a Co-Head to a business that did not firmly abide by regulatory guidelines and procedures, especially where the other Co-Head was cavalier about securities laws and regulations.

136.    Messina suggested to David Downey (BofA's internal lawyer) the notion of implementing trading policies.

137.    Downey, in turn, took it up with Trepanier.

138.    Trepanier was angered that Messina suggested to BofA's legal representative to impose written trading guidelines upon Trepanier.

139.    Secondary CLO guidelines used the primary CLO transactions guidelines as a template, as it had been in use for several years prior.

140.    Despite her intimate knowledge of these guidelines, Messina was never again asked to weigh in on the formulation and drafting of the secondary transaction guidelines.

141.    To Messina's knowledge, no other business within BofA's massive Fixed Income, Currencies and Commodities ("FICC") Division, has transaction guidelines; there are no guidelines for what traders should or should not be doing, which, according to Trepanier, **"is**

**how we like it."**

142.     Naturally, in spite of the institution of strict trading guidelines and policies, Trepanier continued to engage in unlawful trading activities and practices.

<u>UNLAWFUL TRADING PRACTICES</u> **("FRONT-RUNNING")**

143.     In or around March 2016, a customer account named Citi Treasury (Citibank, N.A.'s internal investing group) contacted Messina to inquire about buying secondary positions of AAA CLO tranches.

144.     Citi Treasury is a consistent customer of the primary CLO business and has historically only invested in primary CLOs.

145.     This time, however, Citi Treasury wanted to take advantage of an opportunity in the secondary market to source CLO AAA paper and also to take advantage of trading in the secondary CLO market.

146.     Messina explained to them how it works, and also offered her help in sourcing bonds for them.

147.     Without revealing the names of each client to the other, Messina spoke to another account, GoldenTree Asset Management, about sourcing some of their AAA portfolio to sell to Citi Treasury.

148.     Messina asked the secondary desk to price those bonds to cross between the two accounts, i.e., put a price on them to trade.

149.     This trade would generate a fee for BofA for risklessly trading these positions between clients.

150.     Messina also had a conversation with Trepanier about sourcing the AAA bonds and selling them to Citi Treasury.

151.    Trepanier responded, **"If we're able to source bonds, we're going to buy them for BofA's own trading book and not sell them to a competitor."**[2]

152.    What Trepanier just described was an example of front running, and Messina called him out on it.

153.    Messina bluntly replied, **"You do this all the time. But you should know that it is front running, it is illegal, and I don't agree with it."**

154.    Trepanier responded to Messina that he did not care what she thought.

155.    Trepanier inevitably purchased the AAA CLO bonds Messina sourced from GoldenTree and kept them for BofA's profit.

156.    Citi Treasury was never offered the bonds to purchase, despite their stated interest.

157.    To this day, the concerns Messina raised regarding illegal trading activity fell on deaf ears.

### HILDENE AUCTION RUN ILLEGALLY BY TREPANIER EXPOSES BOFA TO SIGNIFICANT LIABILITY

158.    In February 2016, Trepanier was hired by Hildene, a hedge fund, to run an auction of TruPS CDOs. This is very unusual as trading desks do not run auctions.

159.    Trustees are typically responsible for running an auction process as they have no relationship with the buyer or seller and can therefore act impartially.

160.    In this instance, David Trepanier negotiated a flat $10 million fee from Hildene to auction their portfolio.

161.    This confidential process is governed by NDAs. Hildene is one of if not the

---

[2] Citi Treasury is not, in fact, a competitor; but rather the treasury of Citigroup, an investor (not the broker-dealer).

largest trading counterparty in Global Structured Credit Products.

162.    Since BofA never served as an auctioneer before, there was no process or procedure in place for conducting such an auction.

163.    However, guidelines for conducting such an auction are well established in the industry.

164.    Instead of establishing guidelines or using those set by the industry in order to protect BofA, Trepanier arbitrarily chose whom to show the auctioned portfolio to and what information to share with those accounts on a selective disclosure basis.

165.    In doing so, Trepanier not only violated rules and SEC regulations, but also exposed BofA to liability from the auction participants and Hildene.

166.    Said differently, all information is required to be shown to all market participants at the same time.

167.    This makes the auction process fair, and makes the market efficient with the best price going to the seller.

168.    For example, Hildene may assert that the highest bid was not obtained because of Trepanier's selective disclosure to a few, but not all, bidders; those who Trepanier wanted to see win the auction.

169.     Alternatively, cover bidders who came in with the 2nd highest bid could assert that Trepanier failed to disclose information, which would have lead to a winning bid for the cover bidder.

170.    Lastly, bidders who would otherwise have bid, but did not, would assert that Trepanier's manipulation of the auction process, by sharing bid information only with his cronies at other firms, resulted in a flawed outcome, and where prices set affect other holders in the

marketplace.

171.    Accounts bid in the auction with whatever information Trepanier shared with them, some receiving more information than others - as a result, there were several complaints from accounts involved in the auction about Trepanier's flawed and cavalier process and the lack of information.

172.    Two of the accounts with complaints were Blackstone and Anchorage.

173.    Blackstone's complaints about the bad process Trepanier was running went to DeMare, Head of FICC.

174.    Blackstone has a huge client relationship with BofA and Trepanier's behavior damaged that relationship with FICC and other co-workers at BofA who were undoubtedly tarnished by this unsavory practice.

175.    Trepanier's bad behavior negatively affected BofA's reputation in the eyes of Blackstone, which affects all other BofA employees who are trying to do business with this significant market participant and client.

176.    Anchorage's complaint was worse.  They asserted that they were deceived and misinformed by Trepanier who knowingly provided them with false data, causing them to improve their bid against themselves and in having to needlessly pay more.

177.    Typically, in an auction process, there is an impartial trustee running the process who is not paid an exorbitant fee, who is not a trading counterparty to the auction processor and who shares the same information at the same time across accounts without bias.

178.    Trepanier's former Co-Head of CLO Trading at BoA is the responsible partner at Hildene.

179.    Surely this crony relationship was not disclosed to the market participants.

180.    Subsequent to the completion of the auction, both Trepanier and Kotsen made a trip to visit with Anchorage's Chief Investment Officer to personally apologize for the auction process.

181.    At that meeting, a private "We will make it up to you" was negotiated; an undisclosed quid pro quo.

### TREPANIER VIOLATES AGING INVENTORY RULES BY MISMARKING HIS BOOK

182.    Until recently, the secondary trading desk owned, along with CLO's, $4 Billion on the BAML balance sheet of TruPS CDOs and ABS CDOs which positions were acquired during the 2008/2009 time frame.

183.    These positions have been mismarked for years in order to ensure P&L every year.

184.    Trepanier and his traders have daily fights about marks (where the bonds are priced) with Pricing (another department who marks the Bank's securities to the market price).

185.    When going through their business after being promoted, Messina asked Trepanier about the marks he had on the Bank's trading positions. Trepanier boldly responded,

**"It is an annuity so that the trading book produces revenue every year."**

186.    Of the $4 Billion, two-thirds was below investment grade, and one-half of that two-thirds was equity purchased for cents on the dollar and marked up very slowly over the years since they were first purchased.

187.    In essence, the P&L that comes from trading is not actually from trading, but from this $4 billion book that has been owned by the Bank since the 2008 financial crisis.

188.    Kotsen was not only aware of this but supported and promoted Trepanier in this illegal behavior.

189.   Post the "Volker Rule" implementation, Trepanier has made it his full time job to find improper exceptions for his enormous book of positions that have been owned for more than seven years.

190.   Trepanier does this for his own selfish motives, to garner big bonuses, despite the harm done with this crookery to BofA's shareholders.

191.   Coyly, Trepanier verbally tells his subordinate traders to book trades, so that he can plausibly deny and claim ignorance.

192.    The credit business and regulatory representatives work to find exceptions to Volker, rather than adhering to the rule, in order to make more money for themselves.

193.   Messina has raised this concern in all of her recent meetings with Jim DeMare and his response was, **"*Really*?"** But again, there was no follow-up and no eagerness to solve the problem.

194.   It is an art at BofA to avoid the regulatory rules to make P&L.

### ILLEGAL TRADING ACTIVITIES – HIDING BEHIND CLIENTS

195.   To this day, Trepanier and his traders will partner with accounts such as Whitebox Advisors ("*Whitebox*") to buy bonds in new issue offerings.

196.   Trepanier instructs his traders to use Whitebox as a "cover" to access new issue deals.

197.   For example, Whitebox will say to the bank arranging the new issue, **"I want to buy an entire tranche on the XYZ or Blackrock new issue CLO."**

198.   The order will include what both of them want to buy, and then on a pre-arranged and collusive basis, Whitebox will split the order with BofA without disclosing to Whitebox or the market who is actually the buyer.

199.    As far as the arranging bank knows, Whitebox is the buyer/investor for the entire tranche.

200.    Because there is no trace or record of the transfer, BofA winds up participating in the primary market as a participant, which is a compliance no-no.

201.    Thus, though the syndicate book says "Whitebox order for…", it is *not* Whitebox, but rather Trepanier and BofA.

202.    Essentially, Trepanier is purchasing the security at the new issue price.

203.    Trepanier boasts of his knowing deceptions on the market participants.

204.    As a dealer, BofA is prohibited from going into a new issue syndicate with an order; so Trepanier hides behind accounts for the benefit of the Bank and his bonus.

205.    In simplistic terms, Messina has told BofA's regulatory lawyers, ***"BofA cannot do indirectly what BofA cannot do directly."***

206.    Trepanier talks openly about buying and holding "prop trading."

207.    In the post regulatory world following 2008, there is no longer propriety trading, or, buying for the trading account (the BofA balance sheet; its own account).

208.    The only way that traders are allowed to trade post-Volker is for customers.

209.    So when you are buying, you buy under Rent D – which says there has to be customer demand when you buy something for BofA's inventory.

210.    Everything Messina's Co-Head Trepanier does flies in the face of that rule.

211.    Everything Trepanier does, Kotsen knows of and condones.

212.    When accounts (Symphony, Sankaty Investors, and others) ask David Trepanier and his trading team for offers on CLO equity, David will not offer his positions.

<u>OTHER EXAMPLES OF UNLAWFUL TRADING PRACTICES – KAVI GUPTA LIES TO PIMCO</u>

213.    Within the past year, in or around the Fall of 2015, the Head of Rates Trading, Kavi Gupta, was caught erroneously marking up the trading blotter to PIMCO.

214.    In Messina's business, you don't have an obligation to speak, but if you do, you MUST tell the truth to a customer.

215.    A significant customer, PIMCO asked Gupta to confirm in writing what he had told them about prices, and then, in an effort to cover up his material lies and misrepresentations, he doctored the Trade Blotter document by altering numbers on the blotter to cover up his lies.

216.    This deception and lying behavior is illegal.

217.    When PIMCO complained about this significant effort at deception, DeMare flew out to Los Angeles to do damage control with this huge bank relationship.

218.    Specifically, DeMare went to see PIMCO in an attempt to smooth things over with PIMCO and apologize on Gupta's behalf to a huge bank client and relationship.

219.    PIMCO's managers made DeMare rot in a conference room in California; they did not take his meeting.

220.    After an entire day, DeMare was shamed into leaving PIMCO's office without ever making the intended face-to-face apology for Gupta's criminal behavior (see, Jesse Litvak criminal conviction and Adam Siegal indictment).

221.    Despite this illegal activity, BofA did not self-report as it is required to do. Rather, Gupta was rewarded and paid a full $6 million bonus in 2015, because PIMCO decided to not put the bank "in the box."

222.    Another example of improper trading took place within the Mortgage Trading department.

223.   A CMBS trader tried to buy a bond knowing that it was going to be called, before the announcement of the call – he tried to buy the bond from Angelo Gordon ("*AG*"), a big asset manager and important BofA customer.

224.   Andy Solomon, the Portfolio Manager at AG, called the trustee; the trustee told them that BofA knew about the call.

225.   AG would not trade with BofA for a long time after this (referred to as being "put in the box") – another situation that Jim DeMare had to try to smooth over.

226.   Other bank employees were hurt by this taint.

227.   In yet another example occurred in or around late 2015, Trepanier sold a large portfolio of TruPS CDOs to Kerry Findlay at Third Point, a hedge fund.

228.   Kerry Findlay has expertise in the mortgage asset class, not the TruPS asset class.

229.   Trepanier spoke with her about the positions over a period of time and got her to buy the portfolio. He was very open on the desk that he "stuffed her" with the portfolio.  In other words, Trepanier was boastful that he over-charged Findlay.

230.   Messina had lunch with Kerry Findlay after this event to catch up and talk about the market.

231.   After having this lunch, Trepanier found out about it, and called her BofA salesperson, Rashaan Reed, who was also at the lunch, endeavoring and inquiring, what happened at the lunch, *i.e.*, what did Megan say, what did they talk about?

232.   Rashaan said, "**What are you talking about?!**" and he then said, "**Any meetings, calls that we have with Kerry, I want to be involved.**" Trepanier was deathly afraid she was going to get wind of his used car salesman scammery.

233.   Kotsen is in daily dialogue with Trepanier about trading decisions and knew of

this rip off.

234.     Despite its foreknowledge and obligation to do so, BofA violated Securities Laws by failing to self-report these incidents to Self Regulatory Organizations such as the SEC and FINRA.

<u>**MESSINA IS RETALIATED AGAINST FOR HER GOOD FAITH COMPLAINTS OF UNLAWFUL ACTIVITIES**</u>

235.     Recently, Messina expressed her dismay over Trepanier's unlawful, unethical, and improper practices and activities, exposing the firm to regulatory and legal liability.

236.     As detailed earlier herein, Messina lodged complaints during her multiple conversations with DeMare and Mehta of HR.

237.     In doing so, Messina is a "whistleblower" as that term is defined in Dodd-Frank and is thus subject to the whistleblower protections of Dodd-Frank.

238.     Messina's conversations with Trepanier and her eyewitness accounts of his actions were reported by Messina to Jim DeMare as part of her overall complaint about the business.

239.     When Messina recounted several instances to DeMare in which Trepanier recklessly and obnoxiously flouted law, policies, and regulations; and his incredulous response was limited to, **"Really?"**

240.     DeMare did not inquire further. It then occurred to Messina that DeMare's compensation is directly correlated to the profit generated by Trepanier's illegal trading activities.

241.     Rather than intervene and counsel Kotsen or Trepanier concerning their respective unlawful behavior towards Messina and as described herein, BofA found it easier to retaliate against Messina and force her out of BofA.

242.    Shockingly, after four unsuccessful meetings with DeMare recounting incidences of discriminatory behavior and unlawful trading practices, he suggested that Messina sever her employment with the bank, even though the bank had previously never taken issue with Messina's performance of her skills, duties and responsibilities, or the conditions under which she executes them.

243.    Messina rejected the concept of leaving her gainful employment, especially since she is supposed to be protected from being retaliated against and punished for making legitimate, lawful complaints.

244.    In an effort to pressure (and induce) Messina to leave BofA quickly and quietly, a written severance agreement was hastily prepared and it proposed that for a ludicrous and insulting payment of merely $123,000 plus continued vesting of her previously earned, awarded and unpaid unvested equity and deferred compensation awards, Messina would give up her claims and gainful employment and career.

245.    After receiving no substantive response to her requests for management to intervene and make Messina whole for her grotesque pay downs, Messina sought counsel and retained the employment lawyer, Jonathan Sack, of Sack & Sack, LLP.

246.    On April 28, 2016, Messina's attorney wrote to in-house lawyers at BofA, Molly Tatman and Amy Litman.

247.    In that note, Messina's attorney expressed his belief that Messina was being paid less than her male peers because of Kotsen's animus and discriminatory bias against women and Messina in particular or, alternatively, Messina was being paid down and being treated less than her male peers in respect of responsibility and visibility and opportunities for career advancement because Messina was not a member of Kotsen's "bros club".

248.    It was also communicated to BofA that Messina was being retaliated against for her vocal opposition to Trepanier's illegal trading activities and that Messina refused to, and did not, engage in unethical and perhaps illegal trading activities.

249.    Subsequently, after engaging a back and forth with Messina's attorney on Friday, April 29, 2016, Messina's attorney was advised that Messina should not return to work on Monday, May 2, 2016, while BofA purportedly investigates Messina's allegations under the guise that she was stressed out and needed time off.

250.    To no avail, Messina's attorney protested this unwarranted and unilaterally imposed forced "leave," pointing out that Messina's absence from work without explanation would undoubtedly damage her career and reputation as, inevitably, the rumor mill would surmise that Messina must be guilty of doing something wrong in order to warrant her sudden unexplained disappearance from the desk that she Co-Heads.

251.    In essence, BofA is punishing the victim by excluding her from work in a real and visible way.

252.    Since being suspended from work, as Messina's counsel predicted, the rumor mill swirls; Messina receives several text messages daily from co-workers and external business partners asking, ***"Are you ok? When are you coming back to work?"***

253.    Despite her counsel's protests, Messina received an email from Alexandra Taylor of BofA's HR Department informing Messina that her security access had been disabled and therefore Messina should not even bother attempting to return to work.

254.    Messina has been out of work for over two weeks without reason, excuse, basis or justification and without access to her valued client relationships, coworkers, and timely market information and data, which can only be accessed from her work computer.

255.    Messina is ready, willing and able to perform her job duties, functions, and responsibilities.

256.    Messina has repeatedly requested the ability to return to work, and BofA has refused without explanation, all because Messina made good-faith complaints of discriminatory pay practices and illegal trading behaviors.

257.    Messina is being treated as if she is a criminal and has done something wrong, while Trepanier continues to engage in his off-market crookery under the watchful and approving eye of Kotsen and DeMare.

258.    Messina was requested to participate in an interview with BofA's in-house regulatory lawyer, Chris Chatfield; and BofA retained Regulatory counsel, Noreen Anne Kelly of McGuire Woods.

259.    Messina cooperated fully with the investigation by appearing for a 2.5 hour interview at Mr. Chatfield's office at 50 Rockefeller Center.

260.    The interview took place on Monday, May 9, 2016 at 10AM.

261.    At this interview, Messina was asked to provide details of her knowledge of her written complaints of wrongdoing, which is annexed as exhibit "A" hereto.

262.    Though Messina remained ready, willing and able to return to her gainful employment, to be an active and productive member of BofA management team, and to do her job to the best of her ability, BofA made zero effort to return Messina to active status.

263.    Messina has been prevented from engaging in work-related activities without any legitimate business justification, and this shutout has caused Messina a great deal of anxiety and stress because Messina is unsure whether she is being deemed constructively discharged or whether Messina will be terminated in retaliation for her lawfully protected activities.

264.    Having received no movement by BofA and no explanation as to why she has been improperly suspended, Messina filed a Charge of Discrimination with the EEOC and a whistleblower complaint with OSHA.

265.    Both complaints were filed on May 12, 2016.

266.    On the afternoon of May 12, 2016, Mr. Sack informed BofA's counsel, Joseph Baumgarten of the law firm Proskauer, LLP:

> **"Joe :**
>
> **Having not heard from you, we filed.**
>
> **I advised Megan to report to work tomorrow."**

267.    In response to learning that Messina filed respective complaints with the EEOC and OSHA, Mr. Baumgarten responded:

> **"I actually left you a telephone message earlier. Thanks for letting me know you filed, though. I would appreciate a courtesy copy. <u>Ms. Messina should not return to work until further notice</u>. Thanks."**

268.    As a consequence of the aforementioned, Messina alleges that she has been dramatically underpaid less than her male peers, which difference averages $2.75 million per year.

269.    The sum total equates to $8,250,000 in back pay due Messina. Messina has suffered unlawful discrimination and retaliation at the hands of the Defendants.

270.    As a consequence of Defendants' unlawful actions, Messina has suffered damages as described herein.

271.    On Sunday, May 15, 2015, Messina was informed that in exchange of an

enhanced severance package of $500,000 she can leave the bank without recourse to the wrongs perpetrated upon her.

272.   Messina brings this action to seek redress of the BofA's violations of law which has caused her to suffer damages.

273.   As a remedy, Messina seeks reinstatement to her position, along with back pay and a make-whole payment for 2016 equal to the targets and bonuses provided to many of her male peers in the amount of $6,000,000 and any other compensatory or statutory remedies and/or relief available to Messina.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

## COUNT ONE
### (VIOLATION OF WHISTLEBLOWER PROTECTION UNDER SARBANES-OXLEY, 15 U.S.C. § 1514A)

274.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

275.   BofA is a company within the meaning of 18 U.S.C. § 1514A.

276.   Messina was an "employee" of BofA protected by SOX.

277.   Messina engaged in activity that was protected by Sarbanes Oxley, as more fully detailed herein, which included, but was not limited to, informing her BofA supervisors, concerning conduct that she reasonably believed violated various provisions of federal law.

278.   Messina reported her concerns to persons with supervisory authority over her, and to other such persons working for or on behalf of her employer and federal law enforcement officials.

279.   Messina's employment was terminated in close proximity to the time of her

protected "whistleblowing" actions.

280.    Messina's protected activity was a contributing factor in BofA's adverse employment action against her, which constituted discrimination against Messina in violation of Sarbanes-Oxley, 18 U.S.C. § 1514A.

281.    As a result of BofA's conduct, Messina has suffered, and will continue to suffer substantial damages, including but not limited to lost wages and benefits in the form of back pay, reinstatement or front pay in lieu of reinstatement, interest, attorneys' fees, interest and costs, and special damages, all in amounts to be determined at trial.

**COUNT TWO**
**(VIOLATION OF WHISTLEBLOWER PROTECTION UNDER DODD-FRANK)**

282.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

283.    Messina engaged in protected activity as a whistleblower within the meaning of Dodd-Frank because she engaged in conduct protected by Dodd-Frank.

284.    Messina made these protected disclosures to BofA management and her BofA supervisors.

285.    Messina's disclosure of BofA's unlawful conduct related to her reasonable belief that BofA was engaging, participating, and condoning violations of securities laws.

286.    Messina possessed a reasonable belief that violations of these laws, rules and regulations were occurring, and in fact did occur, when she discovered and disclosed those violations.

287.     BofA violated Dodd-Frank because it either directly or indirectly discharged, demoted, suspended, threatened, harassed, or any other manner discriminated against Messina in the terms and conditions of her employment because of her whistleblower activities.

288.    As a result of BofA's conduct, Messina has suffered substantial damages and is entitled to relief in the form of two times the amount of back pay otherwise owed, reinstatement or front pay in lieu or reinstatement, plus attorneys' fees, interest and costs and any other statutory relief available to her.

### COUNT THREE
**(DISCRIMINATION ON THE BASIS OF GENDER UNDER NYSHRL)**

289.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

290.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

291.    Defendant's animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

292.    As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

293.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL.

294.    As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

295.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name

36

and reputation.

296.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

297.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

298.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount in compensatory damages to be determined at trial from Defendant, jointly and severally, in addition to all other amounts sought herein.

299.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendant, jointly and severally, and to deter Defendant from continuing and repeating such conduct in the future.

### **COUNT FOUR**
**(DISCRIMINATION ON THE BASIS OF GENDER UNDER NYCHRL)**

300.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

301.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

302.    Defendant's animus towards Plaintiff's gender, female, is revealed in instances

where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

303.   As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

304.   The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL.

305.   As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

306.   As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

307.   As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

308.   As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

309.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount in compensatory damages to be determined at trial from Defendant, jointly and severally, in addition to all other amounts sought herein.

310.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT FIVE
### (EPA Against BofA)

311.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

312.    By the acts and practices described above, defendant BofA, in violation of the EPA, has discriminated against plaintiff by paying male employees higher wages than plaintiff was paid for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

313.    Defendant BofA knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiff's statutorily protected rights.

314.    Plaintiff suffered lost wages as a result of BofA's willful and unlawful conduct.

## COUNT SIX
### (Discrimination Under the Labor Law (Against BofA)

315.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

316.    By the acts and practices described above, defendant BofA has discriminated against plaintiff by paying male employees higher wages than plaintiff was paid for equal work in a job, the performance of which required equal skill, effort, and responsibility , and which was performed under similar working conditions, in violation of the New York State Labor Law.

317.   Defendant BofA knew that its actions constituted unlawful violation  of equal pay laws and/or showed reckless disregard  for plaintiff s statutori1y  protected rights.

318.   Plaintiff  suffered  lost  wages  as  a  result  of  BofA's  willful  and unlawful

## COUNT SEVEN
### (New York Labor Law § 215 - Retaliation)

319.   Plaintiff  repeats,  realleges,  and  incorporates  by  reference  each  and  every allegation previously made herein as if the same were more fully set forth at length herein.

320.   In retaliation for Messina 's complaints regarding BofA's unlawful  employment practices, BofA took  adverse employment  actions  against them.

321.   Among  other  things,  BofA  failed  to  provide  Messina  equal  pay  or  promotional opportunities  after  they  complained  about  BofA's  gender  discrimination.   BofA  ultimately terminated Messina.

322.   By reason of BofA's conduct as alleged herein, Messina is entitled to all remedies available under the New York Equal Pay Law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.   A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under applicable Federal Law;

II.   A judgment granting equitable relief directing Defendant to cease and desist from exposing Plaintiff to discrimination and retaliation;

III.   A judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings, including bonus payments, she would have received but for Defendant's

discriminatory treatment and unlawful dismissal, including but not limited to, back pay, double back pay, contractual damages and pension benefits;

V.      A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

VI.     A judgment awarding Plaintiff double back pay damages for Defendant's intentional retaliation of Plaintiff;

VII.    A judgment awarding Plaintiff front pay;

VIII.   A judgment awarding Plaintiff double back pay;

IX.     A judgment awarding Plaintiff contract damages;

X.      A judgment awarding Plaintiff punitive damages;

XI.     An award of prejudgment interest, costs and attorney's fees; and

XII.    Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury in this action.

Dated: New York, New York
May 16, 2016

Respectfully submitted,

**SACK & SACK, LLP**

By _____
        Eric Stern, Esq.

**Attorneys for Plaintiff**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702